# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| RICHARD ACOSTA, on behalf of himself and others similarly situated, ) ) ) | Case No. 05 C 7068 |
| Plaintiffs, ) ) | Judge Joan B. Gottschall |
| v. ) ) | |
| TARGET CORP., TARGET NATIONAL BANK, N.A., and TARGET RECEIVABLES CORP., ) ) ) ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Richard Acosta brought this action against Defendants Target Corp., Target National Bank, N.A., and Target Receivables Corp., (collectively, "Target") on behalf of himself and a putative class of similarly-situated individuals, for violations of the Truth in Lending Act ("TILA"), fraud, breach of contract, tortious interference with business relations, imposition of a constructive trust, and declaratory relief. (Class Action Compl., Doc. No. 1.) This matter comes before the court on Target's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. No. 12.)

### I. BACKGROUND[1]

Between 2000 and 2005, Target implemented an "autosub" program designed to replace certain of its customers' store-only credit cards, referred to as "Guest Cards," with general-purpose Target VISA cards. (*See* Compl. ¶¶ 1, 9-10.) In order to accomplish this, Target sent unsolicited and unapplied-for Target VISA cards to current and former Guest Card users. (*See id.* ¶¶ 11-12.) Recipients could activate their Target

---

[1] The following facts are taken from Acosta's complaint and assumed to be true for purposes of Target's motion to dismiss.

VISAs by calling a toll-free number, or throw them away and continue to use the Guest Card. (*See id*. ¶¶ 15, 49.)

Acosta received one of the unsolicited Target VISAs in 2005 and decided to activate it. (*See id*. ¶¶ 9, 16.) Although Acosta was initially attracted to the Target VISA by its credit limit and interest rate, Acosta eventually discovered that its terms and conditions were significantly less favorable than the ones he had enjoyed as a Guest Card user. (*See id.* ¶¶ 16-23.) Acosta was subject to higher rates and fees under the Target VISA, as well as "stricter underwriting," which ultimately resulted in his account being frozen and his credit limit reduced. (*See id.*) Acosta alleges that he was duped into signing up for the Target VISA, and that he would not have done so had he been aware of the real differences between the Guest Card and the Target VISA. (*See id.* ¶¶ 60-68.)

Acosta subsequently filed a complaint against Target on behalf of himself and a putative class of similarly-situated individuals. (*See id.* ¶ 1.) Count I alleges that Target's autosub program was a violation of TILA's prohibition against unsolicited or unapplied-for credit cards. (*See id*. ¶¶ 41-51.) Count II alleges that Target failed to make certain disclosures required by TILA. (*See id.* ¶¶ 52-59.) Counts III through VI allege various state law causes of action, including fraud, breach of contract, tortious interference, and imposition of a constructive trust. (*See id.* ¶¶ 60-89.) Count VII seeks a declaratory judgment that Target's autosub program violates TILA. (*See id.* ¶¶ 90-94.)

## II.     LEGAL STANDARD

Rule 12(b)(6) allows a defendant to seek dismissal of a complaint that fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In deciding a Rule 12(b)(6) motion, the court must "construe the complaint in the light most favorable

to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in [the plaintiff's] favor." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). Legal conclusions, however, are not entitled to any assumption of truth. *Ashcroft v. Iqbal*, 556 U.S. ___, 129 S. Ct. 1937, 1940 (2009). The plaintiff need not plead particularized facts, but the factual allegations in the complaint must be sufficient to "state a claim to relief that is plausible on its face . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

### III. ANALYSIS

#### A. Count I: 15 U.S.C. § 1642

15 U.S.C. § 1642 provides as follows:

> No credit card shall be issued except in response to a request or application therefor. This prohibition does not apply to the issuance of a credit card in renewal of, or in substitution for, an accepted credit card.

Pursuant to a grant of statutory authority in 15 U.S.C. § 1604(a), the Board of Governors of the Federal Reserve System issued Regulation Z, which states in pertinent part that:

> Regardless of the purpose for which a credit card is to be used . . . , no credit card shall be issued to any person except—
>
> (1) In response to an oral or written request or application for the card; or
> (2) As a renewal of, or substitute for, an accepted credit card.

12 C.F.R. § 226.12(a). The "official staff interpretations"[2] of Regulation Z explain that:

> Substitution encompasses the replacement of one card with another because the underlying account relationship has changed in some way-such as when the card issuer has:

---

[2] The United States Supreme Court has held that "[u]nless demonstrably irrational, Federal Reserve Board staff opinions construing the Act or Regulation should be dispositive . . . ." *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565 (1980). Accordingly, "[t]he official commentary to Regulation Z . . . has been regarded as an 'authoritative interpretation' of the TILA and Regulation Z by [the Seventh Circuit]." *Rendler v. Corus Bank*, 272 F.3d 992, 997 (7th Cir. 2001).

>  i. Changed its name.
>
>  ii. Changed the name on the card.
>
>  iii. Changed the credit or other features available on the account. . . .
>
>  vi. Substituted a card user's name on the substituted card for the cardholder's name appearing on the original card. . . .
>
>  v. Changed the merchant base, provided that the new card is honored by at least one of the persons that honored the original card. . . .

12 C.F.R. Pt. 226, Supp. I Para. 12(a)(2).

Target argues that the Target VISA is a "substitute card" because it changed the "credit or other features" and expanded the "merchant base" available to Guest Card users. (*See* Mem. at 6, Doc. No. 15.) Acosta argues that the Target VISA is not a "substitute card" because the VISA was not provided "because the underlying account relationship *has changed* in some way," but rather as "an *offer to change* [Target's] relationship with the card holder."[3] (Resp. at 5 (emphasis in original), Doc. No. 34.) Assuming the allegations in the complaint are true, the court agrees with Acosta.

According to Acosta, "Defendants allow . . . Target VISA recipients to reject the Target VISA and keep the Target Guest Card." (Compl. ¶ 49.) Even if a cardholder activates the Target VISA, the Guest Card still "remain[s] capable of being reactivated and used to make additional purchases." (*Id*. ¶ 30; *see also id*. ¶ 50.) Thus, Acosta and

---

[3] Target does not respond directly to Acosta's argument in its briefs. (*See* Reply, Doc. No. 42.) Instead, Target relies on Judge Pallmeyer's ruling in *Muro v. Target Corp.*, No. 04 C 6267, 2005 WL 1705828 (N.D. Ill. July 15, 2005), another TILA case involving Target's autosub program. (*See* Mem. at 2-7.) In *Muro*, Judge Pallmeyer granted Target's motion for summary judgment, holding that the Target VISA was a "substitute card" because Target changed the credit and other features on the account, and expanded the card's merchant base. *Muro*, 2005 WL 1705828, at *6. Judge Pallmeyer's opinion does not, however, address the question of whether Target's autosub program was issued because of, or merely offers, a change in the underlying account relationship. (*Compare* Resp. at 5 *with Muro*, 2005 WL 1705828, at *6.) *Muro* is therefore unavailing to Target in the face of Acosta's current argument.

the other class members had the option of keeping their relationship with Target *exactly the same*. The Target VISA did not therefore reflect any "change in the underlying account relationship," but rather an offer to change that relationship at the user's election. Acosta also alleges that Target VISAs were sent to former Guest Card holders who had previously cancelled their accounts. (*See id.* ¶ 11.) For these class members, the Target VISAs could not have represented a "change in the underlying account relationship" for one simple reason: there was no account relationship to change. Thus, the Target VISA is not a "substitute card" within the meaning of section 1642. To hold otherwise would allow credit card issuers to inundate their current and former customers with offers for new credit cards, thereby circumventing TILA's prohibition against unsolicited cards. Acosta has therefore stated a valid claim that Target's autosub program violates section 1642.[4]

**B.    Count II: 15 U.S.C. § 1637(a) & (c)**

15 U.S.C. § 1637(a) requires that issuers of credit cards make certain disclosures "[b]efore opening any account under an open end consumer credit plan." 15 U.S.C. § 1637(c) requires that certain disclosures be made in "[a]ny application to open a credit card account for any person under an open end consumer credit plan, or a solicitation to open such an account without requiring an application, that is mailed to consumers . . . ."[5]

---

[4]    Target cites *Spengler v. Sears, Roebuck & Co.*, 878 A.2d 628 (Md. Ct. Spec. App. 2005), in support of its assertion that the Target VISA is a "substitute card." (Reply at 2-4.) Nowhere in *Spengler* does the court discuss section 1642, regulation Z, or what it means to be a "substitute card." *See Spengler*, 878 A.2d at 635-36. The case is therefore inapposite.

[5]    The precise disclosure requirements for sections 1637(a) and (c) are set forth in Regulation Z at 12 C.F.R. § 226.6, which regulates "account opening disclosures," and 12 C.F.R. § 226.5a, which applies to "credit and charge card applications and solicitations."

Target maintains that the Target VISA is not subject to section 1637 because "[r]ather than opening a *new* account, the substitution simply upgraded an *existing* account." (Mem. at 8 (emphasis in original).) Acosta argues that the Target VISA is a "new account" subject to section 1637 because the Target VISA "accesses a different account from the one accessed by the Target Guest Card." (Resp. at 6-7 (citing Compl. ¶¶ 14-17, 31-23, 50, 54, 72, 75).) The court agrees with Acosta.

As a threshold matter, Acosta alleges that many of the Target VISAs were sent to class members who had previously cancelled their Guest Card accounts. (Compl. ¶ 11.) The staff interpretations of Regulation Z clearly state that "[i]f an account has been closed (for example, due to inactivity, cancellation, or expiration) and then is reopened, new account disclosures are required." 12 C.F.R. Pt. 226, Supp. I Para. 5(b)(1)(i)(3). Target was therefore required to make section 1637 disclosures to former Guest Card holders who received Target VISAs in the mail.

Section 1637 also applies to Target VISAs that were sent to current Guest Card users. The staff interpretations to Regulation Z explain that "[w]hether a substitution or replacement results in the opening of a new account or a change in the terms of an existing account for purposes of the disclosure requirements . . . is determined in light of all the relevant facts and circumstances." 12 C.F.R. Pt. 226, Supp. I Para. 5(b)(1)(i)(6)(i). Those facts and circumstances include:

    A.    Whether the card issuer provides the consumer with a new credit card;

    B.    Whether the card issuer provides the consumer with a new account number;

    C.    Whether the account provides new features or benefits after the substitution or replacement (such as rewards on purchases);

D. Whether the account can be used to conduct transactions at a greater or lesser number of merchants after the substitution or replacement (such as when a retail card is replaced with a cobranded general purpose credit card that can be used at a wider number of merchants);

E. Whether the card issuer implemented the substitution or replacement on an individualized basis (such as in response to a consumer's request); and

F. Whether the account becomes a different type of open-end plan after the substitution or replacement (such as when a charge card is replaced by a credit card).

12 C.F.R. Pt. 226, Supp. I Para. 5(b)(1)(i)(6)(ii). "When most of these facts and circumstances . . . are present the substitution or replacement likely constitutes the opening of a new account for which . . . disclosures are appropriate." *Id*. Acosta's complaint clearly alleges five of these six "relevant facts and circumstances." First, Target "provides the customer with a new credit card" by sending each Guest Card user a new Target VISA, which they can activate by calling a toll-free number. (Compl. ¶¶ 14-15.) Second, "[t]he accounts have different account numbers, and the . . . Target VISA account number is not derived from or related to the Target Guest Card account number." (*Id*. ¶ 31.) Third, the Target Guest Card provides several "new features or benefits," including "a higher credit limit and lower APR" than the Guest Card. (*Id*. ¶ 64; *see also id*. ¶ 31.) Fourth, the Target VISA "can be used to conduct transactions at a greater . . . number of merchants" than the Guest Card; whereas the Guest Card could be used only in Target stores, the Target VISA is a "general use" credit card that can be used in almost any store. (*Id*. ¶ 48.) Fifth, the Target VISA was ultimately "implemented . . . on an individualized basis," and "in response to a customer's request," since customers had to

call the toll-free number to activate the card.⁶ (*Id.* ¶ 15.) Thus, Acosta has alleged "most of the facts and circumstances" that suggest the opening of a "new account." *See* 12 C.F.R. Pt. 226, Supp. I Para. 5(b)(1)(i)(6)(ii). Acosta has therefore stated a plausible claim that Target failed to make the disclosures required by section 1637.

**C.    Count III:  Fraud**

    **1.    Preemption**

15 U.S.C. § 1610(e) states that "[t]he provisions . . . of section 1637 of this title shall supersede any provision of the law of any State relating to the disclosure of information in any credit or charge card application or solicitation . . . , except that any State may employ or establish State laws for the purpose of enforcing the requirements of such sections."⁷ The staff interpretations of Regulation Z explain that "state laws prohibiting unfair or deceptive trade practices concerning credit and charge card applications . . . are not preempted." 12 C.F.R. Pt. 226, Supp. I. Para. 28(d)(3).

Target argues that Acosta's state-law fraud claim is preempted by TILA.⁸ (Mem. at 11.) Acosta urges that "Regulation Z expressly exempts Plaintiff's claims from preemption by TILA." (Resp. at 7.) The court agrees with Acosta.

The application of common-law fraud principles to credit card solicitation materials does not, contrary to Target's assertion, "mandate additional disclosures that

---

⁶    Acosta also alleges that the Target VISA and the Guest Card "are reported as distinct accounts to credit reporting agencies," and if a recipient chooses to activate the Target VISA, "the accountholder's credit reports show the Target Guest Card as 'Account Closed by Consumer.'" (Compl. ¶ 31.) These allegations also militate in favor of finding that the Target VISA was a "new account."

⁷    *See also* 12 C.F.R. § 226.28(d) ("State law requirements relating to the disclosure of credit information in any credit or charge card application or solicitation . . . are preempted. State laws relating to the enforcement of [section 1637] are not preempted.").

⁸    The only case cited by Target in support of its preemption argument, *Danna v. Air France*, 334 F. Supp. 52, 59 (S.D.N.Y. 1971), relates only to the preemptive effect of federal airline regulations, and is therefore inapposite. (*See* Mem. 11-12.)

8

federal law does not require." (Resp. at 10.) Rather, the availability of common-law fraud claims provides consumers with recourse to ensure that an issuer's TILA-mandated disclosures are accurate, or "if [the issuer] chooses to make statements beyond those required by TILA, . . . that those statements comport with its state law tort duty to avoid misrepresentation." *Permobil v. Am. Express Travel Related Servs. Co*., 571 F. Supp. 2d 825, 840 (M.D. Tenn. 2008) (rejecting preemption argument under 12 C.F.R. § 226.28(a)). In other words, state law fraud claims serve to "enforce" section 1637's disclosure requirements. To hold otherwise would allow credit card issuers to make misrepresentations with impunity, and such a result would contravene TILA's stated purpose of "assur[ing] a meaningful disclosure of credit terms . . . , and [ ] protect[ing] the consumer against inaccurate and unfair . . . credit card practices." 15 U.S.C. § 1601(a). Indeed, the Federal Reserve staff recognized the importance of preserving fraud claims by expressly providing that "state laws prohibiting unfair or deceptive trade practices concerning credit and charge card applications . . . are not preempted." 12 C.F.R. Pt. 226, Supp. I. Para. 28(d)(3). Most state laws concerning unfair and deceptive trade practices provide consumers with the statutory equivalent of a common-law fraud claim. For example, Illinois' version of the Uniform Deceptive Trade Practices Act states that "[a] person engages in a deceptive trade practice when . . . the person:

> (5) represents that goods or services have . . . characteristics, ingredients, uses, benefits, or quantities that they do not have . . . ;
> . . . .
> (11) makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;
>
> (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

815 Ill. Comp. Stat. § 510/2. If the Illinois Act survives the preemptive effect of section 1610(e), then so must Atkins' common-law fraud claim, which seeks to hold Target responsible for the misleading, or at least confusing, statements it allegedly made in connection with its credit card solicitations. Accordingly, the court finds that Acosta's common law fraud claim is not preempted by section 1610(e). *See Greer v. Majr Fin. Corp.*, 105 F. Supp. 2d 583, 585-90 (S.D. Miss. 2000) (holding that plaintiff's common-law fraud claim not preempted by section 1610(e)).

### 2. Misrepresentation

As a backstop to its preemption argument, Target argues that Acosta's fraud claim is infirm on the merits. (*See* Mem. at 9-11.) According to Target, "the Plaintiff is really complaining not about any affirmative misrepresentations by Target, but rather about five things that Target did *not* say." (*Id.* at 9.) Target argues that "[t]he complaint fails to state a claim for fraudulent concealment because Target owed no duty of disclosure." (*Id*. at 10-11.) Target also suggests that Acosta's fraud claim fails because Acosta "could . . . have discovered the truth through a reasonable inquiry or inspection . . . ." (*Id*. at 11.) Acosta argues that he has "stated with particularity, not only the explicit misrepresentations, but the facts suppressed." (Resp. at 12.) Acosta argues further that "[i]t is not reasonable to expect the recipient of an offer to investigate whether the offer of a credit card line of a given amount and at a given rate is a bona fide offer." (*Id*.) The court agrees with Acosta.

Acosta's claim is not for "fraudulent concealment," as Target attempts to characterize it, but for fraudulent inducement. (*See* Compl. ¶¶ 60-68.) *See N. Am. Truck & Trailer, Inc. v. M.C.I. Comm. Servs., Inc.*, 751 N.W.2d 710, 713 (S.D. 2008) (setting

forth elements of fraudulent inducement).[9] Contrary to Target's assertion, Acosta lists several affirmative misrepresentations allegedly made by Target. For example:

- Target represented that "the only thing that has changed between the Target Guest Card and the Target VISA is the plastic," when in reality users would be subject to "more stringent underwriting criteria." (Compl. ¶¶ 61-62.)

- Target's "primary selling point[ ]" was that the Target VISA had "a higher credit limit and lower APR" than the Guest Card, when in fact the VISA's variable APR, penalty APR, and late charges made it more expensive for certain users. (*Id.* ¶¶ 64, 66.)

- Target represented that Guest Card holders "had to accept the Target VISA or else lose access to their Target lines of credit," when in reality they were free to continue using their Guest Cards. (*Id.* ¶¶ 49, 67.)

Target's argument that Acosta "could . . . have discovered the truth through a reasonable inquiry or inspection . . . " (Mem. at 11) is also misguided. Acosta is not required to undertake any inquiry or inspection where he is the alleged victim of affirmative misrepresentations by Target. *See Engels v. Ranger Bar, Inc.*, 604 N.W. 2d 241, 246 (S.D. 2000) (holding that "as long as [plaintiff] reasonably relied upon the fraudulent

---

[9] According to the complaint, "The Target Guest Card agreement specifies that the laws of South Dakota apply to the agreement." (Compl. ¶ 85.) Target argues that Acosta's fraud claims should be evaluated under Illinois law, since Illinois is "where the fraud occurred." (Reply at 10.) Target's argument fails. "[R]egardless of the breadth of the choice of law provision, tort claims that are dependent upon the contract are subject to a contract's choice of law provisions." *Amakua Dev. LLC v. Warner*, 411 F. Supp. 2d 941, 955 (N.D. Ill. 2006). In deciding whether a claim is "dependent" upon a contract, courts examine whether: "(1) the claim alleges a wrong based on the construction and interpretation of the contract; (2) the tort claim is closely related to the parties' contractual relationship; or (3) the tort claim could not exist without the contract." *Id*. Acosta's fraud claim is "closely related" to and "could not exist without" Acosta's contractual relationship with Target, since the misrepresentations at issue were allegedly used to fraudulently induce Acosta's agreement to the terms of the Target VISA. (*See* Compl. ¶¶ 60-68.) Thus, the court will apply South Dakota law for purposes of evaluating Acosta's fraud claim.

representations of [defendant], 'the reasonableness of his inquiry is irrelevant.'"). Acosta has therefore adequately stated a claim for fraud against Target.

### D. Count IV: Breach of Contract

As Acosta acknowledges in his complaint, the Guest Card agreement contains a provision that gives Target "the right to change this Agreement (including the right to add additional terms) and apply those changes to any existing balance on the account." (Compl. ¶ 26.) Target argues that the "upgrade" from the Guest Card to the Target VISA "was just such a change," and therefore cannot be a breach of contract. (Mem. at 12-13.) Acosta points to another provision in the Guest Card agreement, which states that Target can "limit or cancel your account." (Compl. ¶ 25.) Acosta attempts to characterize this provision as an "express limitation" on Target's right to make changes to the agreement. (*Id.*) Because the Target VISA represents an "enlargement" of the Guest Card account (rather than a limitation or cancellation), Acosta argues that Target breached the Guest Card agreement. (Resp. at 12-13.) The court does not entirely agree with either party, but declines to dismiss Acosta's breach of contract claim at this stage of the proceedings.

Because neither party has attached any of the relevant documents, the court declines to rule on issues relating to the interpretation of the Guest Card agreement or its application to the autosub program.[10] (*See* Compl.; Mot.) What is more, the court rejects Target's argument that Acosta's "voluntary acceptance" of the Target VISA forecloses

---

[10] Although the court declines to rule on these issues, it seems unlikely that a contract provision giving Target the right to "limit or cancel" an account will serve to limit Target's express right to "add additional terms" to the agreement. (Compl. ¶¶ 25-26.) It seems equally unlikely that the autosub program will constitute a breach of the Guest Card agreement when "Defendants allow . . . Target VISA recipients to reject the Target VISA and keep the Target Guest Card." (*Id.* ¶ 49.) Nonetheless, these are factual questions to be resolved at the summary judgment stage.

12

his breach of contract claim. Under South Dakota law[11], "intent to acquiesce or waive is essential to establishing a waiver to a breach of contract . . . , and a waiver must therefore be a voluntary, intentional relinquishment of a known right. *Ducheneaux v. Miller*, 488 N.W.2d 902, 911 N.8 (S.D. 1992). Accordingly, "[n]o waiver exists where acceptance is induced by fraud," and to waive a right, "one must have full knowledge of the facts and knowledge of the breach." *Id*. Though Acosta called the 1-800 number to activate the Target VISA, he and the class members were allegedly "misled by Defendants['] written representations . . . into believing that they had to accept the Target VISA or else lose access to their Target lines of credit." (*Compare* Compl. ¶ 16 *with id*. ¶ 67.) Acosta could not therefore have had "full knowledge" of his rights. Accordingly, the court declines to dismiss Acosta's breach of contract claim.

### E. Counts V Through VII

Target argues that counts V through VII should be dismissed "because they rest upon the same false assumption as the first count," namely that the autosub program violates TILA. (Reply at 13-14.) Since the court has denied Target's motion to dismiss with respect to the TILA counts, Target's motion is also denied with respect to Counts V through VII.

### IV. CONCLUSION

For the foregoing reasons, Target's motion to dismiss [Doc. No. 12] is denied.

ENTER: /s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: July 20, 2010

---

[11] As set forth above, the Guest Card agreement is governed by South Dakota law.