# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **RICHARD ACOSTA and JENIFER ROMAN, on behalf of themselves and others similarly situated,** | ) ) ) | |
| **Plaintiffs,** | ) | **Case No. 05 C 7068** |
| | ) | |
| **v.** | ) | **Judge Joan B. Gottschall** |
| | ) | |
| **TARGET CORPORATION, et al.,** | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Target's slogan is "Expect more. Pay less." This suit is about something unexpected: Target's "Autosub" program, under which Target sent unsolicited Target Visa cards to holders of Target Guest Cards (Target's proprietary credit card). Two recipients of unsolicited Target Visa cards, plaintiffs Richard Acosta and Jenifer Roman, filed suit against Target Corporation, and two of its affiliated entities, Target Receivables LLC (formerly known as Target Receivables Corporation) and Target National Bank (collectively, "Target"). They assert the Autosub program violates provisions in the Truth in Lending Act ("TILA") governing the issuance of unsolicited credit cards, 15 U.S.C. § 1642, and requiring card issuers to provide certain disclosures about new accounts, 15 U.S.C. § 1637. The plaintiffs also assert state law claims of fraudulent inducement, breach of contract, tortious interference with business relationship, and implied trust. Finally, they seek a declaration that Target violated TILA and the credit card agreements associated with their Target Guest Cards.

The plaintiffs' motion to strike a declaration submitted by Target in support of its motion for summary judgment, the parties' cross motions for summary judgment, and the plaintiffs' motion for class certification are before the court. For the following reasons, the motion to strike

is denied as moot, Target's motion for summary judgment is granted, the plaintiffs' motion for summary judgment is denied, and the plaintiffs' motion for class certification is denied.

## I. Background[1]

### A. Target Credit Cards

Starting in 1994, Target began to issue "private label" credit cards, known as Target Guest Cards. Target Guest Card account holders could use their Target Guest Cards to make purchases from Target-owned entities and entities with whom Target had made special arrangements. In 2000, Target began to issue Visa cards bearing its logo. The Target Visa card is a general use credit card that can be used to obtain cash advances and to make purchases anywhere Visa credit cards are accepted.

From 2000 through 2007, Target sought to have holders of Target Guest Cards "upgrade" to Target Visa cards. Dfs.' Mot. Summ J. Ex. M at 3, Dkt. 225. To effectuate this plan, Target sent unsolicited Target Visa cards to over ten million past and current Target Guest Card account holders, along with marketing materials designed to entice recipients to activate their Target Visa cards and increase their card use.[2] From 2000 through the Spring of 2006, this program

---

[1] The plaintiffs seek to strike the affidavit of Target employee Susan Wolf, which is attached to Target's reply in support of its motion for summary judgment. As the court has not relied on the affidavit, the motion to strike is denied as moot.

[2] Target objects to the term "unsolicited," arguing that the credit card agreement associated with the guest card authorized it to send the Visa cards as substitute cards. This is an argument about the merits, not a dispute about the facts. Because holders of Target Guest Cards did not request Target Visa cards, the term "unsolicited" is appropriate.

was known as "Auto-Substitution" or "Autosub."  From the Fall of 2006 through 2007, it was referred to as "Auto-Product Change."[3]

## B.    The Plaintiffs

On June 1, 1999, Acosta applied for a Guest Card at a Target store in Cicero, Illinois. Acosta used his Guest Card from 1999 to 2005.  In October of 2005, Target mailed Acosta his regular monthly statement plus a separate envelope containing a card carrier (an unsolicited Target Visa card attached to an insert with large font, color graphics, and basic credit card information) and a tri-fold brochure.[4]  The first page of the tri-fold brochure contained a summary of terms.  The remaining five pages contained details about the Target Visa card (hereinafter "the tri-fold," the "terms," and the "credit card agreement").  Acosta activated his Target Visa card in November of 2005.

Roman also applied for and obtained a Target Guest Card.  In September of 2004, she had a balance of $412.91 on her Target Guest Card.  That month, Roman received and activated a Target Visa card.  The Visa card had a higher credit limit and a lower minimum payment than

---

[3]  The parties disagree about the propriety of considering the details about Target guests' experiences with the rollouts of the Autosub and Auto-Product Change programs to the extent they differ from the plaintiffs' experiences.  The plaintiffs contend all guest experiences are relevant as they seek to represent a class but they may not represent others who have significantly different experiences.  *See generally Rahman v. Chertoff*, 530 F.3d 622, 626-27 (7th Cir. 2008).  Facts about rollouts that did not affect Acosta or Roman are, therefore, considered only to the extent that they are relevant to Acosta's and Roman's claims.

[4]  Acosta and Roman take issue with the terms "card carrier" and "credit card agreement," contending the materials sent by Target are "marketing collateral."  Pls.' Resp. to Dfs.' Statement of Fact ("SOF") ¶ 15, Dkt. 227.  The court expresses no opinion about the correct verbiage, but adopts Target's terminology as the terms were used in the depositions taken in this case and it is useful to have a shorthand name for the documents sent with Target Visa cards.

the Target Guest Card, as well as a lower interest rate. Roman did not pay her Target Visa card account in full every month. She thus incurred higher late fees and a higher interest rate than she would have under the terms of her Target Guest Card.

## C.    Guest Cards and Target Visa Cards

### 1.    Activating the Target Visa Card

When a holder of a Target Guest Card activated a Target Visa card, three things happened: the Target Visa card's terms became effective, the account holder's balance was transferred from the Target Guest Card to the Target Visa card, and the Target Guest Card generally was deactivated. After Acosta and Roman activated their Target Visa cards, they did not attempt to use or reactivate their Target Guest Cards. Both understood that by activating their Target Visa cards, they would lose access to their Target Guest Cards.

Despite the policy of closing Target Guest Cards when cardholders activated their Target Visa cards, approximately 12,000 Target Guest Card accounts remained open even though the cardholders also activated Target Visa cards. The record does not explain how or why this occurred, nothing indicates that Acosta or Roman could have continued to use their Target Guest Cards, and the parties do not offer any evidence as to whether the 12,000 cardholders had separate accounts for their Target Guest Card and Target Visa card or had a Target Guest Card and a Target Visa card that were associated with a single account.

### 2.    Opting out of the Target Visa Card

Target allowed cardholders to opt out of the "upgrade" to the Target Visa card and keep their Target Guest Cards in three ways. First, if an individual called Target, rejected the Target Visa card, and asked to keep her Target Guest Card, the call center employee could prevent the

Target Guest Card account from being deactivated.  Second, if an individual attempted to make a purchase at Target using her Target Guest Card after Target had mailed the Target Visa card, regardless of whether it had been activated, the cashier would call the Guest Contact Center, and a Guest Contact Center employee would notify the individual that her Target Guest Card account had been closed and offer to close the Target Visa account and re-open the Target Guest Card account.  Finally, Target had telemarketers call over one million individuals who had not yet activated their Target Visa cards as a part of a program it called "Autoclose Activation Campaign."  Pls.' Mot. Summ. J.  Ex. AD.  The telephone call script Target produced in discovery encourages the recipient to activate the Target Visa card, advises her that her Target Guest Card is set to expire, and reveals that a request to keep the Target Guest Card would be granted.

The materials Target sent to Acosta and Roman and other recipients of Target Visa cards did not suggest that recipients could reject the Target Visa cards and keep their Target Guest Cards.  For example, documents sent with Target Visa cards included language such as:  "**We've replaced your Target Card with a Target Visa. . . . Your old Target Card account will be closing soon, so cut up your old Target Card, activate your new Target Visa and start using it today!**" and "Cut up your current Target Guest Card.  It's no longer valid and should be destroyed."  Dfs.' Mot. Summ. J. Ex. M, W at 2 (emphasis in original).  The terms included the statement, "If you do not accept the terms of the Target Visa Card, do not activate the Card.  Your Target Guest Card will be closed to further use and you must pay off any outstanding balance[.]"  Pls.' Mot. Summ. J. Ex. W at 2.

### 3. Information Provided About the Target Visa Card

The terms of the Target Guest Card and the Target Visa card differed. For example, Target used different underwriting criteria for issuing the two credit cards, the credit card agreements are not identical, and only the Target Visa card has an expiration date. In addition, Target's marketing materials stated that the Target Visa card had a higher credit limit and lower APR than the Target Guest Card.

### a. Format of the Disclosures

TILA requires solicitations sent to consumers to open new credit card accounts to contain certain information (*e.g.*, the annual percentage rate ("APR") and fees) in a "tabular format." 15 U.S.C. § 1367(c). Target's 2001 and 2002 Autosub packages contained the required disclosures in a table.[5] The Autosub and Auto-Product Change packages from 2004-2007 did not contain tables.

### b. APR & Finance Charges

Acosta (and others who received Target Visa cards in 2005) received a card carrier that understated the then-applicable APR by .25% and was .25% less than the APR shown on the credit card agreement. Acosta's card carrier listed his account number and his $9,500 credit limit, as well as an APR of 20.24%. Meanwhile, both the terms and the credit card agreement (each contained in the tri-fold) stated: "The ANNUAL PERCENTAGE RATE (APR) FOR PURCHASES is determined by adding a margin of 13.99% to the Prime Rate. For the billing

---

[5] The table of disclosures mandated by 15 U.S.C. § 1637(c) is known as the "Schumer Box," in honor of Charles Schumer, who was responsible for the legislation requiring that credit card terms be clearly outlined in promotional materials. *Roberts v. Fleet Bank (R.I.)*, 342 F.3d 260, 263 n.1 (3d Cir. 2003).

period beginning in September 2005, your APR for purchases would be 20.49%." Dfs.' Mot

Summ. J. Ex. N, at 1, 2. The terms summary stated, "[w]hen you activate your Target Visa Card,

your APRs may be different (and may be higher than) the rate disclosed in this Credit Card

Agreement because of changes in the Prime Rate after August 31, 2005." *Id.* at 1. Target

blames this discrepancy on a change in the prime interest rate that occurred in September of

2005. The parties disagree as to when the card carrier and trifold were printed.

Acosta and Roman also assert that the terms accompanying the Autosubbed Target Visa

cards created the misleading impression that they described all of the differences between the

Target Guest Card and the Target Visa card. The terms describe various finance charges as well

as the regular and penalty APRs and how they are calculated. The headings of the terms provide

as follows:

> **THIS BROCURE CONTAINS IMPORTANT INFORMATION REGARDING CHANGES TO YOUR TARGET CREDIT CARD ACCOUNT.**
>
> **SUMMARY OF CERTAIN TERMS CHANGES**
>
> ***KEY DIFFERENCES BETWEEN TARGET VISA CARD AND TARGET CARD***
>
> THERE ARE DIFFERENCES BETWEEN THE TERMS OF YOUR NEW TARGET VISA CARD AND YOUR PREVIOUS TARGET CARD, AS SUMMARIZED BELOW.

Dfs.' Mot. Summ. J. Ex. N & O (emphasis in original).

At various times between 2000 and 2007, Target Visa cards had higher fees and penalties

than those associated with similarly situated Target Guest Cards. Target Guest Card accounts

were subject to the penalty APR if a card holder missed two consecutive payments, while Target

Visa accounts were subject to the penalty APR if a client missed two payments in a twelve month period.  Both Acosta and Roman made at least one late Target Guest Card payment.

        **c.**       **Credit Limit**

The Target Visa card agreement contained the following provision:  "**CREDIT LIMIT** . . . . You agree that we may change a Credit Limit at any time for any reason not prohibited by law, including, but not limited to, changes your credit capacity, your pattern of payments to us, or your purchasing behavior. . . ."  Dfs' Mot. Summ. J. Ex. N at 2 (emphasis in original).  The credit limit listed on the card carrier was always rounded to a number to between $1,000 and $10,000.  This meant Autosubbed Target Visa cards had a minimum credit limit of $1,000.  In contrast, Target Visa cards opened through an application had starting credit limits as low as $500.

The parties dispute how the credit limit disclosed on the card carrier was calculated.  It is clear, however, that the method of calculating the credit limit disclosed on the card carrier differed from the method used after a Target Guest Card holder accepted a Target Visa card.  In addition, the credit limit for Target Visa cards could decline. For the 2005 Autosub rollout, most individuals who activated a Target Visa card started with a credit limit of $1,000.  By March of 2007, individuals in this group who had credit scores below 649 had their credit limits reduced by an average of $18-76.   The Autosub communications did not disclose that an individual might not continue to qualify for the credit limit listed on the card carrier.

Target intended to prevent Autosubbed accounts from being subject to credit limit changes for the first six months after conversion based upon the application of "existing account underwriting" criteria for Target Visa cards.  Pls.' SOF, Dkt. 213 at  99.  However, Target

surveyed approximately half-million Target Visa card accounts from the 2005 rollout. One tenth

of one percent of account holders experienced a change in their credit limit within one month

after accepting Target Visa cards. A significant majority of that group had their credit limit

reduced rather than increased.

**D.      Target's Ability to Change the Terms of the Agreement**

The parties agree there was an enforceable agreement between Target and holders of

Guest Cards. From 1994 through 2006, Target Guest Card agreements provided, in pertinent

part, that:

> **OUR RIGHTS** – We may limit or cancel your Account. . . . We may call by
> telephone regarding your Account.
>
> . . . .
>
> **OTHER CHANGES TO THIS AGREEMENT** – We have the right to change
> this Agreement and apply those changes to the existing balance. We will make
> any changes in accordance with the law.

Pls.' Mot. Summ. J. Ex. CI (emphasis in original).

From 2000 through 2007, the Target Visa agreements had slightly different language

about Target's ability to change the terms: "**CHANGES TO THIS AGREEMENT**. We have

the right to change this Agreement (including the right to add additional terms) and to apply

those changes to any existing balance. . . ." Pls.' Mot. Summ. J. Ex. N (emphasis in original).

## II. ANALYSIS

According to the plaintiffs: (1) Target violated 15 U.S.C. § 1642 by  substituting Target

Visa cards for Target Guest cards (Count I); (2) Target failed to comply with TILA's disclosure

requirements, 15 U.S.C. § 1637(a) and (c) (Count II); (3) Target defrauded Target Guest Card

account holders by sending the Target Visa card along with misleading documentation (Count

III); (4) Target breached its contract with Target Guest Card account holders (Count IV); (5) when the Target entity associated with Target Visa cards mailed Target Visa cards to holders of Target Guest cards, it tortiously interfered with the relationship between the Target entity associated with Target Guest Cards and Target Guest Card account holders (Count V); (6) Target is liable under an implied trust because it wrongfully converted Target Guest Card accounts into Target Visa Card accounts and thereby received fees and interest (Count VI); and (7) they are entitled to a declaration that Target violated TILA and the credit card agreements associated with their Target Guest Cards (Count VII).

The court begins by considering the plaintiffs' motion for class certification and Target's argument that the plaintiffs' claims are barred by a prior class action case in this district challenging the shift from Target Guest Cards to Target Visa cards. It then will turn to the parties' cross-motions for summary judgment, which are directed at all seven counts in the plaintiffs' amended complaint.

**A.      Class Certification**

A plaintiff's request to certify a class should be addressed "[a]s soon as practicable after the commencement of an action brought as a class action." Fed. R. Civ. P. 23(c)(1). Thus, courts usually consider class certification motions before ruling on dispositive motions. *See Cowen v. Bank United of Tex., FSB*, 70 F.3d 937, 941 (7th Cir. 1995). "But 'usually' is not 'always,' and 'practicable' allows for wiggle room." *Id.*; *see also Chavez v. Illinois State Police*, 251 F.3d 612, 629, 630 (7th Cir. 2001) ("If 'as soon as practicable' occurs after a case is already 'ripe for summary judgment' then it might be proper for a judge to consider a motion for summary judgment prior to considering a motion for class certification.").

The parties briefed the cross-motions for summary judgment at the same time as the plaintiffs' motion for class certification. Given the pending cross-motions for summary judgment and the complexity of the motion for class certification, the court will consider the cross-motions for summary judgment before the motion for class certification. *See Muro v. Target Corp.*, No. 04 C 6267, 2005 WL 1705828, at *3 (N.D. Ill. July 15, 2005).

**B.      Res Judicata and Collateral Estoppel**

This is not the first case about Target's attempt to convert Target Guest Cards to Target Visa cards. In *Muro v. Target Corp.*, which was assigned to Judge Pallmeyer, plaintiff Christine Muro alleged she received an unsolicited Target Visa card in the mail even though her Target Guest Card account had been closed for five years. 580 F.3d 485 (7th Cir. 2009). She neither activated the Target Visa card nor incurred any fees associated with it.

Judge Pallmeyer granted partial summary judgment for Target, finding that Muro could not prevail on her state law claims because she could not establish she had been harmed or that Target benefitted from the alleged torts since Muro did not activate the Target Visa card. Judge Pallmeyer also held that under TILA, 15 U.S.C. § 1642, "the issuance of Target Visa Cards to [active] Target Guest Card holders qualifies as a valid substitution." *Muro*, 2005 WL 1705828, at *5, 7. Next, she denied Muro's motion for class certification as to her § 1642 substitution claim, explaining that Muro had failed to show that a class of individuals who had closed their Target Guest Cards was so numerous as to make joinder impracticable. She then allowed Muro to proceed individually under § 1642. Discovery proceeded and the parties briefed the § 1642 issue, as well as Muro's claim that Target failed to comply with TILA's disclosure requirements, 15 U.S.C. § 1637.

In the meantime, Muro sought leave to amend her complaint to add Acosta (her brother) as another named plaintiff. Target objected and Judge Pallmeyer denied the motion for leave to amend "without prejudice to Acosta filing his own lawsuit," reasoning, "I think [Acosta] may have a valid claim [under § 1642, for which the court had already granted summary judgment to Target]. I don't want to bring him into a [case] where he has got the burden on his shoulders of a court having disposed of at least one significant claim against him." *Muro v. Target Corp.* No. 04 C 6267, Dkt. 171 (N.D. Ill. Dec. 8, 2005); Pls.' Resp. Ex. A, Dkt. 228 (Muro Hr'g. Tr. Dec. 8, 2005 at 10:9-12).

After Acosta filed his own case, Target moved to reassign it to Judge Pallmeyer as related to *Muro*. Judge Pallmeyer denied the motion to reassign, stating that reassignment would not lead to a substantial saving of time and effort and would delay resolution of *Muro*. Judge Pallmeyer ultimately granted summary judgment for Target on Muro's § 1637 disclosure claims. First, she found that Target's disclosures were timely even though they accompanied the unsolicited Target Visa cards because they occurred before the card was activated. Second, she held that Muro lacked standing to argue that the disclosures accompanying the Target Visa card were not in a tabular format because Muro neither paid a fee nor used the Target Visa card. Target made Muro an offer of judgment as to her § 1642 substitution claim. Muro accepted and judgment was entered in favor of Muro as to that claim.

Muro appealed the ruling on her § 1637 disclosure claim and the denial of class certification as to this claim. Acosta was denied leave to intervene on appeal. The Seventh Circuit affirmed but explicitly declined to rule on Acosta and the putative class's § 1642 claims, noting, "[w]e express no opinion as to whether those class members whose open Guest Cards

were 'autosubstituted' successfully could claim . . . that the Autosubstitution program 'issued' new Visa Cards that were neither a renewal of nor a substitute for their Guest Cards." *Muro*, 580 F.3d at 493 n.7. The Seventh Circuit then declined to address class certification as to Muro's § 1637 claim based on her settlement of that claim.

Acosta and Roman concede that the Seventh Circuit's decision in *Muro* disposes of their § 1637(a) disclosure claim. The parties, however, dispute whether it bars any of their other claims. Generally, a party cannot be estopped from raising a claim if she was not a party to an earlier case litigating that claim. *See, e.g.*, *Richards v. Jefferson Cnty.*, 517 U.S. 793, 799 (1996). The exception to this rule is when the party's interests were adequately represented in the earlier case or "the relationship between the parties present and those who are absent is such as legally to entitle the former to stand in judgment for the latter." *Id.* at 799-800 (internal quotations omitted).

Here, neither Acosta nor Roman were parties to the *Muro* action and no class in *Muro* was certified. In addition, both Judge Pallmeyer and the Seventh Circuit explicitly reserved judgment as to Acosta's claims and rebuffed his efforts to participate in the Muro litigation at the district court and appellate levels. Moreover, the fact that this case is similar to *Muro* is unsurprising as Target successfully opposed motions in *Muro* to add Acosta as a named plaintiff and to certify a class which would have included Acosta and Roman. Thus, the interests of Acosta and Roman were not adequately represented in *Muro*.

Target next stresses that when Acosta moved to intervene in Muro's appeal, he offered to be bound by the disposition of her case. According to Target, this offer is binding and bars Acosta's current claims. This contention is a non-starter given that the Seventh Circuit refused

to allow Acosta to intervene and declined to reach his claims.  Accordingly, Acosta is not bound

by his rejected offer to be bound by the decision in the *Muro* case. The court thus turns to the

parties' cross-motions for summary judgment.

## C.    The Cross-Motions for Summary Judgment

### 1.    Standard of Review

Summary judgment is appropriate when there is no genuine dispute as to any material

fact, the movant is entitled to judgment as a matter of law, and the nonmoving party cannot

establish the existence of an essential element of its case on which it will bear the burden of

proof at trial.  Fed. R. Civ. P. 56; *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009); *Kidwell

v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).  When considering a motion for summary

judgment, the court construes all facts and makes all reasonable inferences in the light most

favorable to the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Because the parties filed cross-motions for summary judgment, the court must evaluate each

motion by construing the facts against the non-moving party.  *FTC v. Cleverlink Trading Ltd.*,

519 F.Supp.2d 784, 792 (N.D. Ill. 2007) (describing a "Janus-like" perspective on cross-motions

for summary judgment).  Finally, speculation or a mere scintilla of evidence will not suffice to

defeat summary judgment.  *Roger Whitmore Auto. Servs. v. Lake Cnty.*, 424 F.3d 659, 669 (7th

Cir. 2005).

### 2.    Renewals/Substitutions Under 15 U.S.C. § 1642 (Count I)

Section 1642 of TILA provides, in pertinent part, that "[n]o credit card shall be issued

except in response to a request or application therefor.  This prohibition does not apply to the

issuance of a credit card in renewal of, or in substitution for, an accepted credit card."  15 U.S.C.

§ 1642.  In Count I of their complaint, the plaintiffs assert that the unsolicited issuance of Target

Visa Cards to Target Guest Card account holders violated § 1642 because: (1) Target Guest Card

account holders did not request or apply for Target Visa cards; and (2) the Target Visa cards

could not be substitutions for Target Guest Cards as Target did not close the accounts associated

with the Target Guest Cards in a timely manner.  This turns on whether Target Visa cards were

valid substitutions for Target Guest Cards and, if so, whether Target terminated the Guest Cards

in a timely manner.

### a. Were the Target Visa Cards Valid Substitutions for Target Guest Cards?

In *Muro*, Judge Pallmeyer found that Target Visa cards were valid substitutions for

Target Guest Cards as long as the recipients receiving Target Visa cards had active Guest Card

accounts at the time the Target Visa cards were sent.  *Muro*, 2005 WL 1705828, at *5, 7.  In

support, she relied on Regulation Z and staff interpretations of that regulation.  Regulation Z

provides that, "[r]egardless of the purpose for which the credit card is to be used . . . no credit

card shall be issued to any person except: (1) In response to an oral or written request or

application for the card; or (2) As a renewal of, or substitute for, an accepted credit card."  12

C.F.R.

§ 226.12(a)(1)-(2).

"Unless demonstrably irrational, Federal Reserve Board staff opinions construing [TILA]

or Regulation [Z] should be dispositive[.]"  *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555,

565 (1980); *Rendler v. Corus Bank*, 272 F.3d 992, 997 (7th Cir. 2001) (the official commentary

to Regulation Z is an "authoritative interpretation" of TILA and Regulation Z).  The staff

interpretation of Regulation Z explains that, "[s]ubstitution encompasses the replacement of one

-15-

card with another because the underlying account relationship has changed in some way such as when the card issuer has: . . . [c]hanged the credit or other features available on the account . . . . [or] [c]hanged the merchant base." 12 C.F.R. Pt. 226, Supp. I ¶ 12(a)(2).

The Target Visa card has different features than the Target Guest Card. For example, the Target Visa cards can be used anywhere Visa cards are accepted and have different credit limits, fees and penalties, and terms and conditions than Target Guest Cards. These are the kind of changes that constitute a substitution under the staff commentary to Regulation Z. *Muro*, 2005 WL 1705828, at *6; 12 C.F. R. pt. 226, Supp. I, ¶ 12(a)(2) at 417.

The plaintiffs nevertheless argue that because Target Guest Card holders could reject the Target Visa cards and keep their Target Guest Cards, Target Visa cards were not substitutions for Target Guest Cards. Staff commentary to Regulation Z provides that when an original account continues to exist after a purported substitution:

> The substitution of one card with another on an unsolicited basis is not permissible . . . where in conjunction with the substitution an additional credit card account is opened and the consumer is able to make new purchases or advances under both the original and the new account with the new card. For example, if a retail card issuer replaces its credit card with a combined retailer/bank card, each of the creditors maintains a separate account, and both accounts can be accessed for new transactions by use of the new credit card, the card cannot be provided to a consumer without solicitation.

Official Staff Commentary, 12 C.F.R. pt. 226, Supp. I, ¶ 12(a)(2).

The plaintiffs' argument does not hit the bulls-eye. The record shows that after a Target Visa card was activated, the balance on Target Guest Cards was carried forward onto the Target Visa card. At that point (with exceptions that are discussed below), the Target Guest Card was canceled. Similarly, the failure to accept the Target Visa card automatically canceled the corresponding Target Guest Card. Pls. Mot. Summ. J. Ex. W at 2 ("If you do not accept the

terms of the Target Visa Card, do not activate the Card.  Your Target Guest Card will be closed to further use and you must pay off any outstanding balance[.]").  Thus, the Target Visa card and the Target Guest Card accessed the same account and the same line of credit.

It is true that under limited circumstances, if Target Guest Card holders acted affirmatively, they could keep their Target Guest Cards in lieu of accepting the proffered Target Visa cards.  Target argues that this was the exception rather than the rule and stresses that generally, Target closed Guest Card accounts after Target Visa cards were sent, either because the holders activated the Target Visa cards or did nothing.  In other words, as a general rule, when Target sent a Target Visa card to a Target Guest Card holder, that action set off a chain of events which led to a change in the underlying account relationship as, at the least, Target closed the account holder's Target Guest Card account.  *See* 12 C.F.R. Pt. 226, Supp. I ¶ 12(a)(2).

To the extent that a Target Guest Card holder was able to retain her Guest Card, she had to reject the Target Visa card affirmatively.  The Autosub program, therefore, was an "either/or" regime.  Most Target Guest Card holders, like the plaintiffs, activated the Target Visa card and used that going forward instead of their now-closed Target Guest Card.  Other Target Guest Card holders did nothing, which resulted in the closure of their Target Guest Card accounts.  A small subset affirmatively rejected the Target Visa Card and asked (despite the literature stating that their Target Guest Card accounts would be closed) to keep their Target Guest Card accounts active.  Critically, however, the plaintiffs do not point to any evidence showing they activated their Target Visa Card and simultaneously retained an active Target Guest Card.  Instead, their Target Guest Cards were canceled when their Target Visa Cards were activated.  This means that as to Acosta and Roman, Target's Autosub program was not merely an offer to change their

-17-

relationship with Target; it did in fact change their relationship with Target. *See* Official Staff Commentary, 12 C.F.R. pt. 226, Supp. I, ¶ 12(a)(2).

The court also notes that the plaintiffs appear to be operating under the misapprehension that they prevailed on their § 1642 claim when that claim survived a motion to dismiss. When denying the motion to dismiss in this case, the court stated:

> Assuming the allegations in the complaint are true . . . class members had the option of keeping their relationship with Target *exactly the same*. The Target Visa did not therefore reflect any "change in the underlying account relationship," but rather an offer to change that relationship at the user's election . . . . To hold otherwise would allow credit card issuers to inundate their current and former customers with offers for new credit cards[.]

*Acosta v. Target Corp.*, 728 F. Supp. 2d 968, 972 (N.D. Ill. 2010) (emphasis in original).

The court now has the benefit of a fully developed summary judgment record. Acosta and Roman did not attempt to keep their Target Guest Cards and reject the Target Visa cards sent by Target. Instead, they activated their Target Visa cards and lost access to their canceled Target Guest Cards. Moreover, no evidence shows that the named plaintiffs believed they could reject or tried to reject the Target Visa cards. This is consistent with the fact that the materials sent to Acosta and Roman stated that the Target Visa card replaced the Target Guest Card. *See* Dfs.' Mot. Summ. J. Ex. M, W at 2 (emphasis in original) ("**We've replaced your Target Card with a Target Visa . . . . Your old Target Card account will be closing soon, so cut up your old Target Card, activate your new Target Visa and start using it today!**"); *id.* ("Cut up your current Target Guest Card. It's no longer valid and should be destroyed."); Pls. Mot. Summ. J. Ex. W at 2 ("If you do not accept the terms of the Target Visa Card, do not activate the Card. Your Target Guest Card will be closed to further use and you must pay off any outstanding balance[.]").

Theoretically, Acosta and Roman could have kept their relationship with Target exactly the same by disregarding Target's clear mandate that their Target Guest Cards would be canceled whether they activated the Target Visa card or not. This did not happen (and also did not happen with the vast majority of Target Guest Card holders who were similarly situated to Acosta and Roman because they activated their Target Visa cards and lost access to their Target Guest Card accounts). Thus, the Target Visa card was a substitution as it effected a change in the underlying account relationship between the named plaintiffs and Target. This means that Target is entitled to summary judgment on the plaintiffs' § 1642 claim.

### b.    Timing of the Cancellation of Target Guest Cards

This conclusion is not altered by the plaintiffs' fall-back argument that even if the Target Visa cards were lawful substitutions for Target Guest Cards as of the time the Target Visa cards were mailed, Target nevertheless violated § 1642 because it neither terminated the Guest Cards in a timely manner or permanently closed all of the affected Guest Card accounts. With respect to the speed of termination, the plaintiffs concede that for Target Visa cards sent as part of the Autosub program, the corresponding Target Guest Cards were automatically terminated in approximately one day. The plaintiffs cite to no authority indicating this time frame is too slow.

Though the official staff comments to Regulation Z contemplate that the substituted card will be voided, they do not impose any requirements about timing. Specifically, the comments state:

> The card issuer need not physically retrieve the original card, provided the old card is voided in some way; for example: . . . The issuer includes with the new card a notification that the existing card is no longer valid and should be destroyed immediately [or] . . . The card issuer, in order to preclude use of the card, reprograms computers or issues instructions to authorization centers.

12 C.F.R. Pt. 226 Supp. I, ¶ 12(a)(2)(7).  Target told recipients of Target Visa cards that their Target Guest Cards had been "replaced" and instructed them to cut up their Target Guest Cards because they are "no longer valid and should be destroyed."  *See* Dfs.' Mot. Summ. J. Ex. M, W at 2.  This complies with the staff comments requiring an issuer to "include[] with the new card a notification that the existing card is no longer valid and should be destroyed immediately."  12 C.F.R. Pt. 226 Supp. I, ¶ 12(a)(2)(7).

The plaintiffs also stress that Target allowed Target Guest Card account holders to re-activate their Guest Cards.  Specifically, as noted above, if a Target Guest Card account holder attempted to make a purchase at Target using a Guest Card after Target mailed a Target Visa card, regardless of whether the Target Visa card had been activated, the Guest Card account holder would be told her Guest Card account was closed but she could choose to close the Target Visa account and re-open the Target Guest Card account.  The plaintiffs offer no support for the proposition that canceling a replacement card and re-opening a closed account, both at a consumer's request, somehow changes the character of the replacement card and renders it a nullity.

Next, the plaintiffs direct the court's attention to two sub-sets of the putative class: (1) individuals who received but did not activate Target Visas cards in 2006–2007 as part of the Auto-Product Change program had their Target Guest Cards terminated over a much longer period, as long as 120–150 days after the mailing of the Target Visa cards; and (2) the approximately 12,000 individuals who simultaneously had active Target Guest Cards and Target Visa cards.  Members of both sub-sets theoretically could have used both cards.  Neither Acosta nor Roman had simultaneously open Target Guest Cards and Target Visa cards.  Whatever merit

these claims may have (an issue that the court need not reach), neither named plaintiff is a member of either of the potential sub-classes. Thus, the court declines to consider the merits of claims that could be brought by members of the two sub-sets of the putative class. *See Muro*, 2005 WL 1705828, at *13. Accordingly, Target is entitled to summary judgment as to Count I.

### 3. Disclosures Under § 1637 (a) and (c) (Count II)

#### a. § 1637 (a)

The plaintiffs' complaint seeks relief under 15 U.S.C. § 1637(a), which contains provisions about disclosures that must be provided to consumers "[b]efore opening any account under an open end consumer credit plan." The plaintiffs concede they are not entitled to relief under §1637(a) because of the Seventh Circuit's decision in *Muro*. Thus, Target's motion for summary judgment is granted as to the § 1637(a) claim.

#### b. § 1637 (c)

Pursuant to § 1637(c), a mailed "application to open a credit card account . . . or a solicitation to open such an account without requiring an application" must include certain information in a "tabular format." 15 U.S.C. § 1637(c); 12 C.F.R. § 226.5-6 (detailing disclosures required for solicitations and new accounts). Target argues that § 1637(c) is inapplicable because it merely upgraded Target Guest Card accounts to Target Visa card accounts. According to Target, as part of that upgrade, it complied with 12 C.F.R. § 226.9, which details the disclosure requirements for changes to existing (as opposed to new) accounts.

The versions of TILA, Regulation Z, and the official staff comments in effect at the time of the conduct challenged in this suit provide no guidance on the meaning of two critical words in § 1637(c): "open" and "account." The parties dispute whether the court should consider 2004

and 2010 official staff comments to Regulation Z which post-date the conduct at issue in this case.

### i.      2004 Staff Comment

The plaintiffs first contend that Target's disclosures were inadequate based on the following 2004 official staff comment to Regulation Z:

> If an account has been closed (for example, due to inactivity, cancellation, or expiration) and then is reopened, new initial disclosures are required. No new initial disclosures are required, however, when the account is closed merely to assign it a new number (for example, when a credit card is reported lost or stolen) and the new account then continues on the same terms.

12 C.F.R. pt. 226, Supp. I, ¶ 5(b)(1)(i)(3) (2004). By its terms, this comment applies only to accounts that have been closed and then re-opened or accounts that are given a new number but continue under the same terms. Acosta and Roman's Target Guest Card accounts were closed after they activated their Target Visa cards and were not reopened. Moreover, it is undisputed that the terms of Target Visa cards differed from the terms applicable to Target Guest Cards. Even if the 2004 comment was retroactive, it thus is inapplicable.

### ii.      2010 Staff Comment

When this court denied Target's motion to dismiss the plaintiffs' § 1637(c) claim, it relied on a 2010 official staff interpretation of Regulation Z, 12 C.F.R. Pt. 226, Supp. I ¶ 5(b)(1)(i)(6)(i). *Acosta*, 728 F. Supp. 2d at 973. This interpretation contains a multi-factor test to determine if a substitute card is a new account that must be accompanied by initial disclosures. The court previously found that based on the allegations in the amended complaint, Target was required to provide disclosures under the multi-factor test. *Id*. The summary judgment record is consistent with the allegations in the complaint. Target thus concedes that

the comment "does suggest tha[t] a new account may result from an upgrade to a general-purpose credit card[.]" Dfs.' Mem. Supp. Mot. Summ. J. at 15, Dkt. 224. Nevertheless, it stresses that the actions at issue in this case predate the 2010 comment. It thus asserts the court should not apply the comment retroactively.

Target does not appear to have previously asserted a retroactivity argument. In the interests of justice and in an exercise of its discretion, the court will consider it at this time, with the benefit of the parties' oversize briefs and the complete summary judgment record. *See Neuma, Inc. v. Wells Fargo & Co.*, 515 F. Supp. 2d 825, 850 (N.D. Ill. 2006).

In May of 2009, Congress passed the Credit Card Accountability Responsibility and Disclosure Act of 2009 (the "CARD Act"). 123 Stat. 1734. The CARD Act amended § 1637 of TILA by, among other things, requiring credit card providers to give account holders at least 45 days advance notice of significant changes. *See* 12 C.F.R. § 226.9. In response, the Federal Reserve Board amended Regulation Z and issued new official staff interpretations. *See* "Truth in Lending," 74 Fed. Reg. 54124-01, 2009 WL 3363955 (Oct. 21, 2009) ("The Board proposes to amend Regulation Z, which implements the Truth in Lending Act, and the staff commentary to the regulation in order to implement provisions of the Credit Card Accountability Responsibility and Disclosure Act of 2009.").

One of the new 2010 official staff interpretations was 12 C.F.R. Pt. 226, Supp. I ¶ 5(b)(1)(i)-6, which was issued "to clarify the application of the disclosure requirements in §§ 226.6(b) and 226.9(c)(2) when one credit card account is substituted or replaced with another." Truth in Lending," 2009 WL 3363955, at *524131. According to the Federal Reserve Board, the comment was "intended to provide card issuers with some flexibility regarding whether to treat

the substitution or replacement as the opening of a new account (subject to § 226.6(b)) or a change in the terms of an existing account (subject to § 226.9(c)(2))." *Id.*

The plaintiffs argue that because the comments were meant to clarify, they apply retroactively because they restate previously existing law. In other words, the plaintiffs assert that the use of the word "clarify" shows that the requirements in ¶ 5(b)(1)(i)-6 existed prior to being memorialized in the 2010 staff interpretation and thus applied when Target sent out Target Visa cards to Acosta and Roman in 2004 and 2005.

Although ¶ 5(b)(1)(i)-6 uses the word "clarify," it does not specify whether it was meant to provide further details about existing law or the newly-enacted law it implemented. Turning first to the plain language of ¶ 5(b)(1)(i)-6, there is no suggestion that the section provides further detail about already existing law. *See, e.g., Negusie v. Holder*, 555 U.S. 511, 542 (2009) (when interpreting a statute, the court must always begin with its plain language). Such a conclusion is inconsistent with the fact that ¶ 5(b)(1)(i)-6 was created after the CARD Act was enacted, Regulation Z was amended, and the Federal Reserve Board issued new official staff interpretations to, among other things, "provide card issuers with some flexibility regarding whether to treat the substitution or replacement as the opening of a new account . . . or a change in the terms of an existing account." *See* "Truth in Lending," 2009 WL 3363955, at *524131.

It is similarly inconsistent with the general purpose of the official staff interpretations, which is to provide detail that is lacking in TILA or Regulation Z. *See Pettineo v. GE Money Bank*, No. 10 C 2569, 2011 WL 1163308, at *4 (E.D. Pa. Mar. 30, 2011) (official staff interpretations clarified the phrase "clear and conspicuous" relating to disclosures by defining that term); *Morrissey v. Webster Bank, N.A.*, 417 F. Supp. 2d 183, 187 (D. Mass. 2006) (official

staff interpretations clarified ATM signage requirements about fees by explaining when notices had to be posted); *Dixon v. S & S Loan Service of Waycross, Inc.*, 754 F. Supp. 1567, 1571 (S.D. Ga. 1990) (official staff interpretations clarified an aspect of the disclosed finance charge required by § 1605 of TILA ).

In sum, the court declines to elevate form over substance by finding that the word "clarify" necessarily means "provide further detail about a pre-existing legal obligation." Instead, the court finds that "clarify" means "interpret." *See Rendler*, 272 F.3d at 997 (the official commentary is an "authoritative interpretation" of TILA and Regulation Z); *Clemmer v. Key Bank N.A.*, 539 F.3d 349, 354 (6th Cir. 2008) (analyzing newly-enacted statute based on official staff interpretation that "clarifie[d] the two-part disclosure scheme established in Section 904(d)(3)(B) of the [Electronic Funds Transfer Act]"); *see also Christopher v. SmithKline Beecham Corp.*, — U.S. —, 132 S.Ct. 2156, 2167 (2012) (former employees were not entitled to overtime compensation based on a retroactive application of the Department of Labor interpretation of its regulations as "[t]o defer to the agency's [current] interpretation . . . would seriously undermine the principle that agencies should provide regulated parties fair warning of the conduct a regulation prohibits or requires") (internal quotations and alterations omitted).  The court thus concludes that the multi-prong test in ¶ 5(b)(1)(i)-6 applies only to conduct post-dating the effective date of the CARD Act.  Target's motion for summary judgment as to the plaintiffs' § 1637(c) claim is, therefore, granted.

### 4.    State Law Claims

Having disposed of the federal claims, the court chooses to exercise supplemental jurisdiction over the state law claims as substantial judicial resources have already been

committed to this litigation, which has been pending in federal court since 2005. *See Davis v. Cook Cnty.*, 534 F.3d 650, 654 (7th Cir. 2008). As discussed in this court's prior opinion, South Dakota law applies to the state law claims. *Acosta v. Target*, 728 F. Supp. 2d 968, 976 n.9, n.11 (N.D. Ill. 2010). For the following reasons, Target is entitled to summary judgment on the state law claims of fraud (Count III), breach of contract (Count IV), tortious interference with business relationship (Count V), and implied trust (Count VI), and the plaintiffs are not entitled to a declaratory judgment (Count VII).

### a. Fraud (Count III)

The plaintiffs first contend that Target fraudulently misrepresented the interest rate associated with Acosta's Target Visa card. The APR listed on the card carrier sent to Acosta was .25% lower than the APR disclosed in the attached terms and the credit card agreement, which correctly disclosed the APR in effect when Acosta received the Target Visa card. Target mailed Acosta's card carrier in October of 2005. The parties disagree as to when the card carrier and trifold were printed. Target blames the discrepancy on a change in the prime interest rate that occurred in September of 2005.

Regulation Z provides that an APR is accurate if it was "in effect within 60 days before mailing." 12 C.F.R. § 226.5a(c)(2)(i) (2011); 12 C.F.R. § 226.5a(b)(1)(ii) (2004) (same). It is undisputed that the lower APR was in effect 60 days before mailing. Thus, under Regulation Z, the APR on the card carrier is not actionable as Acosta cannot state a claim for fraud based on a statement that complies with TILA. *See* 12 C.F.R. § 226.28(d) ("State law requirements relating to the disclosure of credit information in any credit or charge card application or solicitation . . .

are preempted.  State law requirements relating to the enforcement of [the disclosure requirements in § 1637] are not preempted.").  Thus, his fraud claim based on the APR fails.

Second, the plaintiffs identify a host of allegedly misleading statements in the card carrier and accompanying materials they received and assert these misrepresentations fraudulently induced them to activate their Target Visa cards.  *See Acosta*, 728 F.Supp. 2d at 975 (rejecting Target's contention that Acosta's fraud claim was preempted).  The elements of fraudulent inducement under South Dakota common law are:

> [T]hat a representation was made as a statement of fact, which was untrue and known to be untrue by the party making it, or else recklessly made; that it was made with intent to deceive and for the purpose of inducing the other party to act upon it; and that he did in fact rely on it and was induced thereby to act to his injury or damage.

*N. Am. Truck & Trailer, Inc. v. M.C.I. Comm. Servs., Inc.*, 751 N.W.2d 710, 713 (S.D. 2008).

"[M]isrepresentations include true statements which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matter."  *Maybee v. Jacobs Motor Co., Inc.*, 519 N.W.2d 341, 343 (S.D. 1994).

Specifically, the plaintiffs argue that Target falsely represented that "the only changes to Target's relationship with the consumer were spelled out in the terms," which the plaintiffs define as the first page of the tri-fold brochure that also contained the credit card agreement.  Pls.' Mot. Summ. J. at 18.  The evidence, however, shows that the terms included the headings "**SUMMARY OF CERTAIN TERMS CHANGES**" and "**KEY DIFFERENCES BETWEEN TARGET VISA CARD AND TARGET CARD.**"  Dfs.' Mot. Summ. J. Ex. N & O (emphasis in original).  These expressly refer to additional differences, which are spelled out in the credit card agreement that is part of the same tri-fold document.

Next, the plaintiffs assert Target fraudulently induced them to accept the Target Visa card by representing that they qualified for the specified credit limit and APR, Target expected them to keep the specified credit limit and APR, and Target's underwriting criteria (including sensitivity to late payments) would remain the same. The materials Target sent with the Target Visas cards do not include any of these statements. This would normally end the court's inquiry.

The plaintiffs, however, appear to be arguing that the materials implicitly made the statements by referring to the Target Visa card as an upgrade and failing to explain the different ways that the Target Visa card and Target Guest Card calculate credit limits and the APR. According to the plaintiffs, the Target Visa card was a "bait and switch" tactic as it highlighted the positives but failed to disclose the negatives. They also characterize the credit limit and APR listed on the card carrier as "faux" because they would not definitively apply in the future. The court cannot credit this argument as Target never represented that the credit limit would apply for a specific period of time or that an individual would never be subject to a higher APR. Instead, Target explicitly (and accurately) disclosed that the credit limit and APR could change.

In addition, Target's description of the Target Visa card as an "upgrade" compared to the Target Guest Card is not fraudulent or misleading given the accompanying disclosures and the differences between the two credit cards. TILA does not require that a credit card's disclosed terms remain in effect for any period of time. Instead, "TILA is a disclosure statute, not a fair pricing law." *Poulin v. Balise Auto Sales, Inc.*, 647 F.3d 36, 38 (2d Cir. 2011) (rejecting TILA disclosure claim against a used car dealer based on the plaintiff's claim that the dealer deceptively buried the cost of credit in the purchase price of cars sold to customers with poor

credit).  Target's disclosures were accurate when made and explained how terms could change; nothing more is required.

Finally, the plaintiffs argue that by failing "to disclose to all Autosub recipients that their Guest Card account need not be closed out if they declined the Target Visa offer," Target misled them into believing they had to accept the Target Visa card to keep access to Target credit.  Pls.' Mot. Summ. J. at 22.  As noted above, materials sent with Target Visa cards advised recipients that, "[i]f you do not accept the terms of the Target Visa Card, do not activate the Card.  Your Target Guest Card will be closed to further use and you must pay off any outstanding balance[.]" Dfs.' Mot. Summ. J. Ex. N & O.  As it is undisputed that Target Guest Card account holders could keep their Target Guest Card accounts open by acting affirmatively, the plaintiffs conclude that Target's representation that Target Guest Card accounts would be close is fraudulent.  In response, Target argues that its representation was truthful – notwithstanding numerous undisclosed exceptions – because it allowed individuals to retain Target Guest Cards at its discretion and on an individually negotiated basis.

The plaintiffs cite no authority for the proposition that common law fraud requires a credit card issuer to qualify every statement which could be negotiated with a cardholder.  If the court were to accept the plaintiffs' position, it would have to find that Target was obligated to disclose that late fees could be lifted at its discretion, the credit limit heightened on request, and so forth.  TILA, Regulation Z, and the official staff comments do not impose this burden.  For Acosta, Roman, and similarly situated Target Guest Card holders who activated their Target Visa cards and had their Target Guest Card accounts closed, Target's statement about closing

Guest Card accounts was accurate.[6]  Thus, the plaintiffs' fraud claims fail so Target is entitled to summary judgment on Count III.

### b. Breach of Contract (Count IV)

The plaintiffs next take issue with the portion of the Guest Card credit card agreement stating, "**OUR RIGHTS** – We may limit or cancel your Account."  According to the plaintiffs, this phrase prohibits Target from making changes which did not "limit" their Target Guest Card accounts.  They reason that since the Target Visa card was an "upgrade," it was an impermissible change that breached the contract between the card issuer and Target Guest Card account holders.  *See* Pls.' Mot. Summ. J. Ex. CI.  In support, they note that under South Dakota law, credit card contracts are "construed narrowly [and] against the creditor."  *Citibank (S.D.), N.A. v. Hauff*, 668 N.W.2d 528, 532 (S.D. 2003).

The Supreme Court of South Dakota, however, applies standard contract interpretation rules to credit card agreements.  *Id.* at 532-33 ("We read and understand . . . contracts according to the natural and obvious import of the language, without resorting to subtle and forced construction or the purpose of either limiting or extending their operation.") (internal citation, alteration, and quotation omitted); *see also Vollmer v. Akerson*, 688 N.W.2d 225, 228 (S.D. 2004) (same).  The interpretation proposed by the plaintiffs is, to put it mildly, strained.  It also is at odds with other language in the "**OUR RIGHTS**" section authorizing Target to act in ways

---

[6]  The court expressly declines to determine if Target's statement was fraudulent via-a-vis the approximately 12,000 Target Guest Card account holders who, for unspecified reasons, were able to keep their Target Guest Card accounts open while also opening Target Visa card accounts.  In this regard, it notes that the record does not indicate whether these dual Target cardholders had two cards associated with a single Target account or had two separate Target accounts.

that do not "limit or cancel" an account.  For example, the section advises Target Guest Card account holders that Target can contact them via telephone.

Coming at the phrase "[w]e may limit or cancel your Account" from a different angle, the plaintiffs next urge the court to compare the Target Guest Card credit card agreement language with language from the Target Visa card agreement, which gives Target the "right to change this Agreement (including the right to add additional terms)."  Dfs.' Mot. Summ. J. Ex. N & O.  The plaintiffs assert that to give the parenthetical in the Target Visa card agreement independent meaning, the court must read the Target Guest Card agreement as allowing only limitations, rather than all types of changes.  The court must thus consider whether it can use extrinsic evidence (the Target Visa card agreement) to interpret the Target Guest Card agreement.

Under South Dakota law, a court may consider extrinsic evidence:  (1) to determine what the intentions of the parties were; (2) after a determination that contract language is ambiguous.  *Vollmer*, 688 N.W.2d at 229.  "Ambiguity is shown where the contract is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.  Further, ambiguity is not created merely because the parties offer different interpretations of the contract."  *Id.* (internal quotation, alteration, and citation omitted).

Here, the Target Guest Card contract is clear:  Target could change the agreement.  Thus, the court may not consider extrinsic evidence.  Moreover, even if the court could consider the language of the Target Visa card agreement, there was a six-year gap between the two agreements.  The language in the Target Visa card agreement, therefore, fails to provide useful extrinsic insight regarding Target's intent.

The plaintiffs' next breach of contract argument fares no better. They stress that South Dakota law requires credit card contracts to be read narrowly. They also note that no provision of the contract associated with Target Guest Cards explicitly allows Target to send a new, different credit card to account holders. They then conclude that Target breached the Target Guest Card contract by sending Target Visa cards to holders of Target Guest Cards. Alternatively, the plaintiffs argue that the Target Visa cards could not permissibly flow from a change to "this Agreement" (*i.e.*, the credit card agreement associated with Target Guest Cards) because Target Visa cards came with their own credit card agreement.

Both arguments fail because the Target Guest Card agreement provided that "[Target] may limit or cancel your Account" and gave Target "the right to change this Agreement and apply those changes to the existing balance." Pls.' Mot. Summ. J. Ex. CI. Target was thus entitled to change the terms of the Target Guest Card agreement and send out new cards with new, revised documentation and did not breach a contract by doing so. Similarly, because the Target Guest Card agreement allowed Target to make changes to that agreement, it was entitled to do so. Once Target made changes, it was required to provide account holders with a copy of the revised agreement. The fact that Target Visa cards came with their own credit card agreement thus fails to show that Target breached a contract with holders of Target Guest cards. Therefore, Target's motion for summary judgment as to Count IV is granted.

### c.     Tortious Interference With Business Relationship (Count V)

The plaintiffs' tortious interference with business relationship claim rests on their contention that when the Target entity associated with Target Visa cards mailed Target Visa cards to holders of Target Guest cards, it tortiously interfered with the relationship between the

Target entity associated with Target Guest Cards and Target Guest Card account holders. The credit card agreement for the Target Visa card stated that when a consumer activated her Target Visa card, she accepted its terms. Similarly, as the plaintiffs themselves argue at length, the Target Guest Card agreement allowed Target to limit or cancel a Target Guest Card account.

To prevail on a claim for tortious interference with a business relationship under South Dakota law, a plaintiff must show that "[t]he intentional and unjustified act of interference on the part of the interferer [were] improper." *Dykstra v. Page Holding Co.*, 766 N.W.2d 491, 499-500 (S.D. 2009). When a party acts pursuant to a contract and complies with applicable laws, its actions are justified. *Id.* at 500. As discussed above, the plaintiffs have failed to establish that Target breached a contract or violated TILA. The acceptance of a Target Visa card or the cancellation of a Target Guest Card thus cannot support an action for tortious interference with contract under South Dakota law. This means that Target's motion for summary judgment as to Count V is granted.

### d.      Implied Trust and Declaratory Relief (Counts VI and VII)

The plaintiffs' implied trust count is premised on its contention that Target wrongfully converted Target Guest Card accounts into Target Visa Card accounts and thereby received a "windfall of fees and interest payments." Am. Compl. ¶ 92, Dkt. 170. The plaintiffs' declaratory relief count seeks a declaration that Target violated TILA and the credit card agreements associated with their Target Guest Cards. As the court has found that Target was allowed to substitute the plaintiffs' Target Guest Cards with Target Visa cards and did not breach the Target Guest Card credit card agreements, Counts VI and VII fail as a matter of law.

**D.      Class Certification**

At long last, the plaintiffs' motion for class certification is before the court. It is axiomatic that in order to certify a class action, the putative "class representative must be part of the class." *Wal-Mart Stores, Inc. v. Dukes*, — U.S. —, 131 S. Ct. 2541, 2550 (2011). The only class claims that survive this order relate to individuals who received but did not activate Target Visas cards in 2006–2007 as part of the Auto-Product Change program and had their Target Guest Cards terminated up to 150 days after the mailing of the Target Visa cards and the approximately 12,000 individuals who simultaneously had ongoing, active Target Guest Cards and Target Visa cards associated with separate accounts. Neither Acosta nor Roman are members of these potential classes as their Target Guest Cards were canceled promptly after they accepted Target Visa cards. The motion for class certification is, therefore, denied with prejudice to the extent it is based on a class that is similarly situated to the plaintiffs and denied without prejudice to the extent it is based on non-similarly situated Target Guest Card account holders.

## III. CONCLUSION

For the reasons explained above, the plaintiffs' motions to strike is denied as moot. Target's motion for summary judgment is granted in its entirety and the plaintiffs' cross-motion for summary judgment is denied in its entirety. The plaintiffs' motion for class certification is denied. The clerk is directed to enter a Rule 58 judgment accordingly.


ENTER:


_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED:   July 3, 2013